**2023 BNH 005**          Note:   This is an unreported opinion.  Refer to LBR 1050-1 regarding citation.
_____

### UNITED STATES BANKRUPTCY COURT
### DISTRICT OF NEW HAMPSHIRE

In re:                                                    Bk. No. 19-11303-BAH
                                                          Chapter 11
NH Highway Hotel Group, LLC,
            Debtor

Ford, McDonald, McPartlin & Borden, P.A.,
            Plaintiff
v.                                                        Adv. No. 21-1008-BAH

Hooksett Landing, LLC,
Amantino Lopes,
Jeffrey Larrabee, and
NH Highway Hotel Group, LLC
            Defendants
_____

Jeffrey Larrabee and
NH Highway Hotel Group, LLC
            Cross-Claimants

v.

Hooksett Landing, LLC and
Amantino Lopes
            Cross-Defendants


*Attorney for Cross-Claimants*
*William S. Gannon, Esq.*
*William S. Gannon PLLC*
*Manchester, New Hampshire*

### **MEMORANDUM OPINION**

## I.  INTRODUCTION

        This proceeding arises out of a complaint (Doc. No. 1) (the "Complaint") filed by

Plaintiff Ford, McDonald, McPartlin & Borden, P.A. (the "Plaintiff") to interplead $30,000 in

funds, the entitlement to which was disputed by NH Highway Hotel Group ("NH Highway") and Jefferey Larrabee ("Larrabee") (collectively, the "Cross-Claimants") and Hooksett Landing, LLC ("Hooksett") and Amantino Lopes ("Lopes") (collectively, the Cross-Defendants").  In their answer to the Complaint (Doc. No. 35) (the "Answer"), the Cross-Claimants asserted their entitlement to the funds and three crossclaims against the Cross-Defendants: (i) breach of contract ("Crossclaim A"),[1] (ii) breach of the implied covenant of good faith and fair dealing ("Crossclaim B"),[2] and (iii) negligent misrepresentation ("Crossclaim C")[3] (collectively, the "Crossclaims").  The Cross-Claimants further asserted that Lopes was individually liable for all damages resulting from Hooksett's various breaches.  Having found both of the Cross-Defendants liable by default, and having previously determined the issue of damages as to Hooksett,[4] the Court is left with the final task of assessing the appropriate calculation of the damages to be awarded to the Cross-Claimants as a result of Lopes' conduct.

---

[1] Crossclaim A alleged that the Cross-Defendants breached the Purchase and Sale Agreement Dated April 9, 2020 (Exhibit 10) (the "P&S Agreement"), which contemplated NH Highway and Larrabee's assignment of NH Highway's right to buy real property located at 39 Hackett Hill Road in Hooksett, New Hampshire and consisting of 54 acres of real property (the "Land"); a sign (also known as the "Digital Billboard"), and "certain access rights" from Ritchie Bros. Properties, Inc. ("Ritchie Bros.") pursuant to an amended Purchase and Sale Agreement dated August 8, 2017 (the "Ritchie Agreement").  The alleged breach was the result of the Cross-Defendants intentionally failing to appear at a hearing regarding NH Highway's motion for approval of an extension agreement that the Cross-Claimants maintain would have given the Cross-Defendants time to close the transaction, and which resulted in the Cross-Claimants' failure to perform their remaining obligations under the Ritchie Agreement.

[2] Crossclaim B asserted that the Cross-Defendants breached the implied covenant of good faith and fair dealing by effectively preventing the satisfaction of the Bankruptcy Court's approval of the extension agreement (the alleged condition precedent) by refusing to appear for the hearing.

[3] Crossclaim C alleged a cause of action for negligent misrepresentation, asserting that the Cross-Defendants negligently misrepresented their ability to fund and close the transaction and pay, perform, and satisfy their duties and financial liabilities, including paying the remaining amount due under the Ritchie Agreement, without financing from any third party.

[4] The Court granted the Cross-Claimants' unopposed Motion for Default Judgment against Hooksett (Doc. No. 71) and entered final judgment against it on February 16, 2022 (Doc. No. 82).  The Court found Lopes in default on May 25, 2023 (Doc. No. 146).

This Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a) and Local Rule 77.4(a) of the United States District Court for the District of New Hampshire.  This is a core proceeding in accordance with 28 U.S.C. § 157(b).

## II.  PROCEDURAL BACKGROUND AND RELEVANT FACTS

To calculate the appropriate damages arising from the Lopes' breach of the P&S Agreement, the implied covenant of good faith and fair dealing, and the associated negligent misrepresentations, the Court must (as requested by the Cross-Claimants in their post-hearing memorandum) set the agreement and the parties' relationship in the context of NH Highway's chapter 11 case (Bk. No. 19-11303-BAH) (the "Bankruptcy Case") and the circumstances that led to its filing.

*The Business Dealings of NH Highway and Ritchie Bros.*

Prior to the commencement of the Bankruptcy Case, Larrabee and NH Highway had a business relationship with Ritchie Bros. that centered around the Land.  During the course of that relationship, Ritchie Bros. acquired the Land, and agreed to sell it back to NH Highway in the event that it decided to relocate its headquarters within a certain time period, which it ultimately did.  In August of 2017,[5] NH Highway and Ritchie Bros. agreed to terms that would allow NH Highway to buy back the Land and certain access rights, all as set forth in the Ritchie Agreement, which was subsequently amended at least eight times.  When its financing fell through, NH Highway commenced the Bankruptcy Case in this District on September 19, 2019 (the "Petition Date") with the hope of obtaining a buyer or financing to effectuate the Ritchie Agreement.

---

[5] There is a discrepancy between the date of the Ritchie Agreement, which is August 8, 2017 (Bankruptcy Case, Doc. No. 39 at Exhibit B), and the date of the agreement as referenced in the P&S Agreement, which is August 8, 2018.  The Court shall construe the reference to the year "2018" in the P&S Agreement as a typographical error and shall analyze the testimony and evidence admitted into evidence with that in mind.

In early December of 2019, Ritchie Bros. moved for relief from the automatic stay to recover possession of the Land, which Larrabee had allegedly been occupying (Bankruptcy Case, Doc. No. 31).  And so began the Cross-Claimants' battle to maintain possession of the Land and, thus, the viability of NH Highway's reorganization effort (Bankruptcy Case, Doc. Nos. 39, 40). The Court granted Ritchie Bros. relief from the automatic stay on January 8, 2020 (Bankruptcy Case, Doc. No. 41).  On January 22, 2020, the United States Trustee (the "UST") moved to dismiss or convert the Bankruptcy Case based on a substantial or continuing loss to or diminution of the estate, and in the absence of a likelihood of reorganization, due to the anticipated loss of NH Highway's ability to purchase the Land (Bankruptcy Case, Doc. No. 46). The next day, NH Highway moved to assume and assign the Ritchie Agreement to AJC Partners, LLC, or its nominee, for a payment of $900,000 (Bankruptcy Case, Doc. No. 51), to which Richie Bros. objected (Bankruptcy Case, Doc. No. 61).  In the motion, NH Highway explained that:

> [p]ursuant to the agreement, upon assignment, [NH Highway] shall have no continuing interest in the [Ritchie Agreement]. It is anticipated that AJC Partners intends to perform the [Ritchie Agreement] contemporaneously with the execution of the assignment. AJC Partners intends to perform under the [Ritchie Agreement] by making a total payment of $7,298,000.00 to Ritchie [Bros.], with a $100,000 payment to Ritchie [Bros.] upon execution of the Assignment Agreement with the remainder due at closing.

Bankruptcy Case, Doc. No. 51 at ¶ 7.  The Court subsequently denied the motion (Bankruptcy Case, Doc. No. 75).  Following the initial February 26, 2020, hearing on the UST's Motion to Dismiss, NH Highway moved for approval of a settlement stipulation with Ritchie Bros., which stated:

> The major asset in this estate that has potential for significant value is [NH Highway]'s rights (if any) under [the Ritchie] Agreement relating to the purchase of land in Hooksett, NH. At the [P]etition

> [D]ate [NH Highway] valued the rights under that agreement at $6,824,929.
>
> …
>
> The proposed settlement . . . permits [NH Highway] the opportunity to convert its rights under the [Ritchie Agreement, as then amended] into cash.

Bankruptcy Case, Doc. No. 80, ¶¶ 1 and 4.

### *The Pandemic & Execution of the P&S Agreement*

On March 13, 2020, the Covid-19 pandemic was declared a nationwide emergency. Shortly after, states began to implement shutdown orders and statewide stay-at-home orders. Despite these events, NH Highway and Ritchie Bros. were able to come to an agreement as to the Land, which is reflected in the stipulation at Docket Entry 80 in the Bankruptcy Case (the "Stipulation"). The Court entered an order approving the Stipulation on April 8, 2020 (Bankruptcy Case, Doc. No. 87). The Stipulation provided NH Highway with additional "runway" to obtain financing or a buyer to buy its rights under the Ritchie Agreement. The next day, the Cross-Claimants and Lopes executed the P&S Agreement.

The P&S Agreement defines the subject "property" as the Land, or more specifically "[a]ll rights of Seller under [the Ritchie Agreement] in the Land" and the purchase of a sign, more particularly described as a digital billboard on Interstate 93 in New Hampshire. It contemplated a total sale price of $9,000,000, $7,200,000 of which was for the Land and $1,800,000 of which was for the sign, and a deposit of $10,000. See P&S Agreement at ¶ 1.[6] It also includes both a liquidated damages clause and a merger clause. The liquidated damages clause is contained in Paragraph 8 of the P&S Agreement and states that "[i]n the event that the Buyer shall default, then the Sellers may retain all deposits as reasonable liquidated damages."

---

[6] The deposit was subsequently increased to $30,000, a fact that Lopes admitted. See Tr. 79:15. The $30,000 deposit is what prompted the commencement of this adversary proceeding as an interpleader.

Paragraph 11 includes a merger clause and provides that "[a]ll representations, statements and agreements heretofore made between the parties are merged in this [P&S] Agreement, which alone fully and completely expresses their respective obligations, and this [P&S Agreement] is entered into by each party after opportunity for investigation, neither party relying on any statements or representations not embodied in this [P&S Agreement] made by the other or his behalf."

Paragraph 16 of the P&S Agreement is entitled "Terms."  Subparagraph (a) of that paragraph states that "[a] new corporation will be created to take ownership of the above referenced property with ownership to be transferred to Hooksett Landing with the following members and shares: [(i)] VadaCann Holdings, LLC 60%, [(ii)] Michael Bouchard 25%, [(iii)] NH Highway Hotel Group, LLC 15%."  The P&S Agreement does not reference any development opportunities having been discussed by the parties or include any general or specific provisions regarding how the Land was supposed to be developed by the Cross-Defendants, the new entity, or otherwise contemplate damages for Lopes' failure to pursue specific development opportunities or generate revenue.  Paragraph 9 of the P&S Agreement states that the transaction was a "cash deal" and that it was not contingent on Lopes obtaining financing.

On April 14, 2020, NH Highway moved for authority to settle, assume and assign the Ritchie Agreement (Bankruptcy Case, Doc. No. 92).  Pursuant to the proposed settlement agreement, "the $7,200,000 would be paid as follows: (a) $6,800,000 to Ritchie [Bros.] and (b) $400,000 to NH Highway."  Id. at ¶ 8.  It further stated that NH Highway would receive a 15% equity interest in the acquiring entity, and that closing would occur on or before April 21, 2020. Id. at ¶¶ 9, 10.  On May 8, 2020, NH Highway moved for approval of an extension agreement with the Cross-Defendants (Bankruptcy Case, Doc. No. 104).  In that motion, NH Highway

stated that [Lopes] represented that Hooksett was unable to transfer the necessary funds from London, England as a result of disruptions caused by the Covid-19 Pandemic and had requested an extension to May 28, 2020 to perform the P&S Agreement.  The motion also stated that "[i]n light of its available alternatives and the ongoing disruption resulting from the global pandemic, [NH Highway] believes its business interest is best served by making every effort to successfully consummate the [P&S Agreement]."

Despite NH Highway's efforts, the Court dismissed the Bankruptcy Case, effective June 18, 2020, and denied approval of the extension agreement as moot on May 28, 2020 (Bankruptcy Case, Doc. Nos. 113 and 114).  Following a hearing on NH Highway's Motion to Reconsider (Bankruptcy Case, Doc. No. 117), NH Highway moved for the third time to assume and assign the Ritchie Agreement (Bankruptcy Case, Doc. No, 134) to Silver City Holdings, WT LLC ("Silver City").  Pursuant to that motion, Silver City would purchase the Land from Ritchie Bros. for $7,200,000 as an assignee of NH Highway under the P&S Agreement.  The motion also contemplated contingent payments for gravel payments and water royalties.[7]  On June 26, 2020, the Court entered an order granting the Motion to Reconsider, vacated the order dismissing the case, and greenlighted the filing of a disclosure statement and chapter 11 plan (Bankruptcy Case, Doc. Nos. 142-44).

Pursuant to the Confirmed Plan (Bankruptcy Case, Doc. Nos. 177, 194), Silver City must pay NH Highway a Gravel Payment of $100,000 if and when Silver City (or other identified parties) obtained a gravel permit within twenty-four months from the sale closing.  The Confirmed Plan also required Silver City to pay NH Highway quarterly Water Payments in

---

[7] The motion described the gravel payment as Silver City agreeing to pay NH Highway the sum of $100,000 upon the receipt, within twenty-four months of closing of a permit to extract gravel from the Land (the "Gravel Payment") and the water royalties as the sum of $0.0025 per gallon from commercial extraction of water (except pursuant to existing easements) from the Land (the "Water Payment").  It further explained that the water royalties were perpetual but unrecorded.

perpetuity in an amount equal to $0.0025 per gallon of water extracted from the premises (if any), with the exception of all water extracted from the premises referenced in the water cistern easement agreements recorded with the Merrimack County Registry of Deeds respectively as (a) Plan #20170 and (b) Book 3385, Page 1321 and other similar easements.  The Confirmed Plan clarified that Silver City was under no obligation to pursue or create a water extraction business of any kind, though Silver City was intending to do so.

*The Adversary Proceeding & Lopes' Default*

On April 19, 2023, NH Highway and Larrabee moved for default judgment against Lopes via the imposition of sanctions pursuant to Federal Rules of Civil Procedure 16(f)(1)(C) and 37(b)(2)(A)(vi), made applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7016(a) (Doc. No. 131) (the "Motion for Sanctions"). [8]  See Fed. R. Civ. P. 16(f)(1)(C) and 37(b)(2)(A)(vi); Fed. R. Bankr. P. 7016(a).  In the Motion for Sanctions, the Cross-Claimants requested the Court's entry of default judgment against Lopes as a sanction, citing his failure to comply with the Court's amended scheduling order (Doc. No. 127) (the "Amended Pretrial Order"), and his noncompliance with prior orders (Doc. Nos. 57 and 65).  On May 16, 2023, the Cross-Claimants filed a Motion for Order Striking Defense (Doc. No. 135) (the "Motion to Strike Defense").

The Court held a hearing on the Motion for Sanctions and the Motion to Strike Defense on May 25, 2023, during which time Lopes acknowledged that he did not comply with the requirements of the Amended Pretrial Order and other orders of the Court.  During the hearing, the Court granted the Motion for Sanctions, finding Lopes in default based on his history of noncompliance with the Court's orders, his other dilatory tactics throughout pendency of this

---

[8] The Court shall refer to the Federal Rules of Civil Procedure as the "Rules" and the Federal Rules of Bankruptcy Procedure as the "Bankruptcy Rules."

proceeding, and his admitted noncompliance with the Amended Pretrial Order.  The Court granted the Motion to Strike Defense without addressing its merits and as a consequence of having found Lopes in default.  See Doc. No. 146.  Having found Lopes in default, the Court scheduled a hearing on damages for June 14, 2023, and ordered the Cross-Claimants to file an affidavit of damages by June 5, 2023, specifying the amount of their respective damages.

On June 5, 2023, the Cross-Claimants filed a Motion for Entry of Final Default Judgment Pursuant to Rule 55(b) (Doc. No. 150) (the "Motion for Default Judgment"), which included Larrabee's Affidavit of Damages (Doc. No. 150-1, Exhibit A) (the "Larrabee Affidavit") and request for total damages of $5,378,000 (which represents $4,878,000 and $500,000 in damages allegedly sustained by NH Highway and Larrabee, respectively).  In support of the requested damages, the Larrabee Affidavit stated that the damages were based on the value of assets that NH Highway and Larrabee lost because of Lopes' breach of contract, breach of the covenant of good faith and fair dealing, and negligent misrepresentation.  The Larrabee Affidavit calculated the total amount of damages as follows:

| | | |
|---|---|---|
| a. | Appraised value of the land | $ 13,860,000 |
| b. | Mitigation – Debt (Bankruptcy Case) | $ (7,000,000) |
| c. | Net Land Value (a-b) = $6,860,000 @ 15% | $ 1,029,000 |
| d. | Value of hotel & restaurant approvals @ 15% | $ 180,000 |
| e. | Gravel Sales @ 15% | $ 300,000 |
| f. | Water Loss @ 15% of projected revenue | $ 3,369,000 |
| g. | Sign (Net After Mitigation)[9] | $ 500,000 |
| | Total: | $ 5,378,000 |

On June 8, 2023, Lopes filed a response to the Motion for Default Judgment (Doc. No. 152), asserting that the Larrabee Affidavit overstated any actual damages claimed by the Cross-Claimants, and that many of the losses claimed by the Cross-Claimants were not a part of their

---

[9] The Larrabee Affidavit explains that Larrabee owned the sign and land on which it was located, in his own name.

agreement.  He further announced his intention to call witnesses during the June 14 hearing.

During the June 14 hearing, the Court determined that an evidentiary hearing was needed to

determine the appropriate calculation method and total amount of damages to be awarded to the

Cross-Claimants upon entry of final judgment.  The Court scheduled an evidentiary hearing on

damages for July 17, 2023, and ordered Lopes to file a supplemental response to the Motion for

Default Judgment by June 21, 2023, that identified and specifically listed any documents relied

upon by Lopes therein and the bases upon which he objected to the Cross-Claimants' calculation

of damages.  The Court also ordered the Cross-Claimants to file a reply to Lopes' response by

June 28, 2023 (Doc. No. 153).  Lopes tardily filed his response on June 22, 2023 (Doc. No. 156)

(the "Supplemental Response") and the Cross-Claimants timely filed their reply and list of

exhibits (Doc. No. 157) (the "Reply").

   During the July 17 hearing, both the Cross-Claimants and Cross-Defendant examined

Larrabee, and Lopes took the stand to testify on his own behalf.  At the start of the hearing, the

Court took judicial notice of the Motion for Default Judgment and the Larrabee Affidavit and

admitted the Cross-Claimants' Exhibits 1-9.  Lopes did not provide any exhibit binders, and

instead relied upon the Cross-Claimants' Exhibit 1, an unsigned copy of the P&S Agreement.[10]

At the conclusion of the hearing, the Court ordered each party to file a post-trial memorandum

addressing the applicable law and purported damages calculation method by July 28, 2023 (Doc.

No. 158).[11]  The Cross-Claimants filed their memorandum on July 28, 2023 (Doc. No. 162) (the

---

[10] The Court admitted Exhibit 1 subject to the admission of the signed P&S Agreement, which was later marked and admitted as Exhibit 10.

[11] Specifically, the Court ordered the parties to address the following: (i) the applicable measure of damages for breach of contract and negligent misrepresentation under New Hampshire law, and supporting case law; (ii) the calculation of the Cross-Claimants' damages based on the party's respective proposed measure of damages for breach of contract and misrepresentation under New Hampshire law; (iii) the impact of the liquidated damages clause contained in the P&S Agreement on the Cross-Claimants' damages for breach of contract; (iv) the Cross-Defendant's contractual duty, if any, to develop and/or otherwise monetize the real estate and related rights contemplated in the P&S Agreement for the benefit of the Cross-Claimants; and (v) the application of the Economic

"Cross-Claimants' Memorandum"), while Lopes did not file his response until July 31, 2023 (Doc. No. 163) (the "Lopes Memorandum").

## III. THE PARTIES' POSITIONS

### A. The Cross-Claimants' Position

The Cross-Claimants assert that the P&S Agreement contemplated the formation and funding of Hooksett to develop the Land, which included monetizing gravel deposits and approvals for water, a hotel, and a restaurant.  As a result, they seek both direct and consequential damages arising from the breach of the contract and other claims.  Pursuant to the P&S Agreement, the Cross-Claimants explain that they accepted what they contend was a fraction of the value of the Land in exchange for a 15% interest in Hooksett and, thus, revenue generated from the monetization of the natural resources on the Land and the hotel and restaurant approvals.  While they acknowledge that the P&S Agreement is silent on the question of how the Land would be developed, the Cross-Claimants maintain that the Court may "vindicate what it infer[s] to have been the parties' reasonable expectations" under the P&S Agreement by examining the "contractual language, the [parties'] prior dealings, and the commercial context in which they dealt . . . ." Centronics Corp. v. Genicom Corp., 132 N.H. 133, 141 (1989).

Regarding the applicability of the Economic Loss Doctrine, the Cross-Claimants acknowledge that it generally precludes contracting parties from pursuing tort recovery for purely economic or commercial losses associated with the contractual relationship.  However, they assert that the doctrine does not preclude their claim for negligent misrepresentation because it is not based merely upon a breach of contract, but upon independent, affirmative misrepresentations unrelated to the performance of the contract.  In other words, the Cross-

---

Loss Doctrine to the Cross-Claimants' claim for negligent misrepresentation and related damages analysis under New Hampshire Law.

Claimants contend that Crossclaim C, which centers around Lopes' representations that he could close and pay the remaining amount due under the P&S Agreement, is separate and distinct from their contractual crossclaims.

Regarding the applicability of the liquidated damages provision, the Cross-Claimants maintain that the liquidated damages provision is not valid under New Hampshire law. First, they contend that the P&S Agreement does not include "boilerplate, mutual representations that (i) the damages anticipated as a result of the breach are uncertain in amount or difficult to prove; (2) the parties intended to liquidate damages in advance; and (3) the amount agreed upon is reasonable and not greatly disproportionate to the presumable loss or injury." Cross-Claimants' Memorandum at 6-7. Second, they contend that the evidence and testimony given at the hearing demonstrates that the damages resulting from the breach were not impossible or even difficult to ascertain. Third, they contend that the liquidated damages of $30,000[12] are not reasonable and greatly disproportionate to the presumable loss or injury.

B. Lopes' Position (Testimony and Memorandum)

During the hearing, Lopes testified regarding his involvement in the transaction, his perception of the P&S Agreement, and what he understood the development plan for the Land to be. Lopes said that he was approached by Mr. Cunningham and Mr. Bouchard because he had been in the mortgage business and had obtained loans on behalf of those gentlemen. Tr. 63:2-7. He explained that Mr. Cunningham presented him with a purchase and sale agreement for $9.2 million for the land and the billboard (sign), and that there was a discussion about some development opportunities, including a hotel or some warehouses. Tr. 63:11-17. Lopes clarified that as far as he knew no concrete plans had been made. He testified that he understood the

---

[12] The Court takes judicial notice of NH Highway's Objection to Creditor Ritchie Bros. Affidavit Pursuant to LBR 9071-1 (Bankruptcy Case, Doc. No. 107), which states that the Cross-Defendants agreed to deliver an additional $20,000 deposit to the Cross-Claimants, for a total deposit (and, thus, liquidated damages) of $30,000.

"rights" that were being purchased under the P&S Agreement to include the "[L]and and the rights within the [L]and, not any construction rights or anything else . . . ." Tr. 66:22-25. He also denied having ever received any of the documents, approvals, or appraisals that the Cross-Claimants relied upon in calculating the claimed damages.

Regarding the alleged approvals for the hotel and restaurant, Lopes stated that he never received any such documents because he was not involved in any of those projects directly. Tr. 64:1-2. He further maintained that he was only involved in getting funding for two purification projects: a robotics system and water purification system. Tr. 64:2-4. Although Lopes asserted that he did not know what Mr. Bouchard had intended to use the water for, he appeared to acknowledge (reluctantly) that the Cross-Claimants' loss of the ability to use the water source, which was attached to the Land, was a potential known consequence of failing to close the transaction. Tr. 71:16-25 to 72:1-2. Regarding the inability to close the transaction, Lopes testified that he had paid $200,000 for two standby letters of credit, which turned out to be non-existent. As a result, Lopes lost the ability to fund the project. Tr. 64:7-17. He also acknowledged that there was no financing contingency under the P&S Agreement or the extension agreement. Tr. 67:20-22; Exhibit 2, ¶ 1.5.

Lopes urges that the Court's inquiry is limited to the four-corners of the P&S Agreement as it contains all the terms and conditions negotiated and agreed upon by the parties, including the liquidated damages provision. In other words, he asserts that the damages sought relating to the monetization of the gravel, water, and hotel and restaurant approvals are speculative and/or beyond the scope the P&S Agreement. As a result, he contends that the actual damages the Cross-Claimants are entitled to are $30,000 per the liquidated damages clause. See P&S Agreement at ¶¶ 1 and 8. Lopes apparently thought that the deposit amount (which was the amount contemplated by the liquidated damages provision) would have to be paid regardless of

whether the transaction went through or not "because that is the standard in all real estate transactions." Tr. 70:15-22.  In his memorandum, Lopes emphasized that Larrabee testified to having provided the appraisals or other documents to Mr. Cunningham and/or Mr. Bouchard, but not to him.

## IV. DISCUSSION

A. Are the Cross-Claimants Entitled to Tort Damages?

To answer this question, the Court must first consider the threshold issue of whether the Economic Loss Doctrine bars the Cross-Claimants from collecting damages arising out of Lopes' negligent misrepresentations.  "The economic loss doctrine is a 'judicially-created remedies principle that operates generally to preclude contracting parties from pursuing tort recovery for purely economic or commercial losses associated with the contract relationship.'" Mentis Scis., Inc. v. Pittsburgh Networks, LLC, 173 N.H. 584, 593, 243 A.3d 1223, 1231 (N.H. 2020) (quoting Plourde Sand & Gravel v. JGI Eastern, 154 N.H. 791, 794, 917 A.2d 1250 (2007) (quotation omitted)).  "The doctrine recognizes that contract and warranty law are better suited than tort law for 'dealing with purely economic loss in the commercial arena.'" Id. (quotation omitted).  By barring contracting parties from suing in tort "'when a transaction does not work out as expected[,]'" the doctrine prevents a displeased contracting party to "'rewrite[e] the agreement to obtain a benefit that was not part of the bargain.'" Id. (quotation omitted).

New Hampshire law recognizes an exception to the doctrine, permitting harmed contracting parties to recover in tort where they are "owed an independent duty of care outside the terms of [a] contract." Wyle v. Lees, 162 N.H. 406, 412, 33 A.3d 1187, 1192 (2011) (citing Plourde Sand & Gravel, 154 N.H. at 794, 917 A.2d at 1255).  See also Mentis Scis., Inc. , 173 N.H. at 594, 243 A.2d at 1232 (finding that the economic loss doctrine barred the plaintiff's negligent misrepresentation claim and explaining that the "claim 'merely relate[s] to a breached

14

promise to perform the terms of the contract' because any duty [the defendant had] to back up the plaintiff's data, and thus confirm that such performance was being rendered, was created by the terms of the contract.  Accordingly, the [plaintiff's] negligen[t misrepresentation] claim [was] indistinguishable from a claim that the defendant failed to perform under the contract.")).

The Court finds that the Economic Loss Doctrine bars the Cross-Claimants' damages for the negligent misrepresentation claim.  While Crossclaim C alleged that Lopes made misrepresentations regarding his ability to close the transaction (Doc. No. 35 at ¶¶ 47-52), which allegedly induced the Cross-Claimants to enter into the P&S Agreement, those allegations directly relate to Lopes' performance under the P&S Agreement (i.e., to purchase the Land).  See Wyle, 162 N.H. at 411, 33 A.3d at 1191 (endorsing a distinction between negligent misrepresentation claims that "center upon an alleged inducement to enter into a contract from those that focus upon performance of the contract).  Although the P&S Agreement was a "cash deal" and not contingent upon the Cross-Defendants' obtaining financing, their inability to do so was the basis for the breach.  Accordingly, it is a harm that is more appropriately addressed by available contractual remedies or a liquidated damages clause that the parties could have (and have appeared to) contemplated.

B.  Are the Cross-Claimants Entitled to Contractual Damages?

"Interpretation of the parties' written agreement is a question of law . . . ."  Orr v. Goodwin, 157 N.H. 511, 514, 953 A.2d 1190, 1193 (2008) (citing Czumak v. N.H. Div. of Dev'tl. Servs., 155 N.H. 368, 373, 923 A.2d 208, 213 (2007)).  "When interpreting a written agreement, [the Court] give[s] the language used by the parties its reasonable meaning, considering the circumstances and the context in which the agreement was negotiated, and reading the document as a whole."  Id.

"New Hampshire law does not require mathematical certainty in computing damages." See T&M Assocs. v. Goodrich, 150 N.H. 161, 164, 834 A.2d 369, 372 (2003). "The law does, however, require an indication that the award of damages was reasonable." Id. "[T]he goal of damages in actions for breach of contract is to put the nonbreaching party in the same position it would have been in if the contract had been fully performed." Robert E. Tardiff, Inc. v. Twin Oaks Realty Trust, 130 N.H. 673, 677, 546 A.2d 1062, 1064 (1988) (quotations omitted). See also Mentis Scis., Inc., 173 N.H. at 588, 243 A.3d at 1231 ("The goal of money damages for a breach of contract is to place 'the injured party in as good a position as [it] would have been in had the contract been performed.'") (quoting Riblet Tramway Co. v. Stickney, 129 N.H. 140, 149, 523 A.2d 107, 112 (1987) (internal quotation omitted))). Importantly, "[t]he central objective behind the system of contract remedies is compensatory, not punitive." Holloway Automotive Group v. Lucic, 163 N.H. 6, 9, 35 A.3d 577, 581 (2011) (quoting Restatement (Second) of Contracts § 356 cmt. a (1981)).

"Contract damages are ordinarily based on the injured party's expectation interest and are intended to give him the benefit of his bargain by awarding him a sum of money that will, to the extent possible, put him in as good a position as he would have been in had the contract been performed." Restatement (Second) of Contracts § 347 comment a (1981). "This principle describes the damages necessary to fulfill an injured party's expectation interest." Mentis Scis., Inc., 173 N.H. at 588, 243 A.3d at 1228. An expectancy interest may be "comprised, in part, of 'the loss in the value to him of the other party's performance caused by its failure or deficiency,' in addition to 'any other loss, including incidental or consequential loss, caused by the breach.'" Id. (quoting Restatement (Second) of Contracts, supra § 347(a)-(b) (1981)).

Consequential damages "are not based on the capital or present value of the promised performance but upon benefits it can produce or losses that may be caused by its absence." Id.

(citation omitted).  See also Restatement (Second) of Contracts, § 347 cmt. c (1981) ("Consequential losses include such items as injury to person or property resulting from defective performance.").  Importantly, damages for expectancy interest, loss in value, consequential damages, or other losses are subject to the contracting parties' agreement, including liquidated damages provisions or those that exclude liability for consequential damages.  See Restatement (Second) of Contracts, § 347 cmt. a (1981).  Moreover, "[d]amages are not recoverable for loss that a party in breach did not have reason to foresee as a probable result of the breach when the contract was made."  Restatement (Second) of Contracts § 351 (1981).  "Loss may be foreseeable as a probable result of a breach because it follows from the breach (a) in the ordinary course of events, or (b) as a result of special circumstances, beyond the ordinary course of events, that the party in breach had reason to know."  Id.

"Damages resulting from a breach of contract are generally calculated from the date of the breach, and not from a prior date."  C & M Realty Tr. v. Wiedenkeller, 133 N.H. 470, 479, 578 A.2d 354, 359-60 (1990) (citing Rankin v. Hojka, 42 Ill. App. 3d 440, 447, 355 N.E.2d 768, 774 (1976); Lake Region Paradise Island, Inc. v. Graviss, 335 So.2d 341, 342 (Fla. App. 1976); Maw v. Fay, 248 Mass. 426, 432, 143 N.E. 315, 316 (1924)).  See also Orr, 157 N.H. at 516, 953 A.2d at 1195 ("[W]e note that in a land sale contract the proper measure of damages is the seller's loss of bargain; that is, the difference between the contract price and the actual value of the real estate at the time of the breach."); Zareas v. Smith, 119 N.H. 534, 537, 404 A.2d 599, 600 (1979) (proper measure of damages is difference between contract price and actual value of real estate at time of breach).  "If the market value of the real estate at the time of the breach is equal to or greater than the contract price, the plaintiff can recover only nominal damages."  Zareas, 119 N.H. at 537, 404 A.2d at 600-01 (citing Hurd v. Dunsmore, 63 N.H. 171, 173 (1884)).  "The burden of establishing that the contract price exceeded the actual value of the real

17

estate at the time of breach is, in this case, upon the plaintiff-seller."  Id. at 537, 601 (citing generally, Lupien v. Rousseau, 98 N.H. 459, 102 A.2d 502 (1954)).

 Under New Hampshire law, courts recognize a distinction between a valid liquidated damages clauses in contracts and what amounts to an unenforceable penalty.  "In a valid [and enforceable liquidation] clause: (1) the damages anticipated as a result of the breach are uncertain in amount or difficult to prove; (2) the parties intended to liquidate damages in advance; and (3) the amount agreed upon is reasonable and not greatly disproportionate to the presumable loss or injury."  Holloway Automotive, 163 N.H. at 9-10, 35 A.3d at 581 (citing Orr, 157 N.H. at 514, 953 A.2d at 1193).  The Supreme Court of New Hampshire has "concluded that '[i]n real estate transactions, projected damages from a breach are difficult to forecast because land values fluctuate."  C & M Realty Tr., 133 N.H. at 478, 578 A.2d at 359 (quoting Bower v. Davis & Symonds Lumber Co., 119 N.H. 605, 609, 406 A.2d 119, 122 (1979) and citing Realco Equities, Inc. v. John Hancock Mut. Life Ins. Co., 130 N.H. 345, 351, 540 A.2d 1220, 1224 (1988) (widely recognized that damages resulting from failed real estate deal difficult to prove)).

 a.  Damages for the Land

 During the hearing Larrabee testified that the damages listed in the Larrabee Affidavit were conservative figures and that he relied on Exhibits 1-10 in calculating the Cross-Claimant's requested damages, including the P&S Agreement, which contemplated the assignment of NH Highway's right to buy the Land, the sign, and certain access rights pursuant to the P&S Agreement.  Larrabee described the nature of the transaction contemplated by the P&S Agreement as "basically a nine million-dollar deal, a million eight for [his] [sign] . . .  and 7.2 million for the [L]and."  Tr. 13:8-10.  He also agreed that the transaction was a part of an ongoing plan to continue the development of the Land at the center of the P&S Agreement.  Tr. 13:11-13.  The Land consisted of "six lots, 54 acres in total, and about 3,000 feet of frontage [on

I-93] and 2,800 feet of frontage [on] Route 3A." Tr. 14:16-17.  See also Exhibit 3 (the "Land Appraisal") at 2.  Larrabee further agreed that under the P&S Agreement, "[NH Highway] was selling and the buyer was buying [NH Highway's] rights under the [Ritchie Agreement]."[13]  Tr. 13:18-21.

In subsections (a)-(c) of paragraph 10 in the Larrabee Affidavit, Larrabee listed damages that pertain to the Land as follows:

|   |   |   |
|---|---|---|
| a. | Appraised value of the land | $ 13,860,000 |
| b. | Mitigation – Debt (Bankruptcy Case) | $ (7,000,000) |
| c. | Net Land Value (a-b) = $6,860,000 @ 15% | $ 1,029,000 |

In support of the amount listed in subparagraph (a), Larrabee testified that he relied on the Land Appraisal prepared by Crafts Appraisal Associates, Ltd., which valued the Land (exclusive of any other approvals) at $13,860,000 as of January 31, 2018, and which Larrabee said he had provided to the Cross-Defendants (via Mr. Cunningham).  Tr. 15:4-8 and 18:2-6; Land Appraisal at 2-3.  He further testified about his background and experience with real estate development and financing and his familiarity with real estate values, explaining that he had been a developer for approximately 30 years.  He also cited his graduate law degree in real estate development and finance from the University of Miami Law School.  Tr. 17:2-10.  Because of this background and considering his familiarity with the value of the Land and other property in the area, Larrabee testified that he believed that the Land Appraisal was "a little light."  Tr. 17:11-21.

---

[13] Paragraph A of the Ritchie Agreement provides:

"Purchaser desires to acquire that certain parcel of real property (the "Land Parcel") which is located at 39 Hackett Hill Rd., Hooksett, NH . . . . Purchaser also seeks to acquire a deeded right to access the Land Parcel from Hackett Hill Road which is more particularly described set forth in the Access Deed recorded in the Merrimack County Registry of Deeds at Book 3384, Page 1493 (the "Access Rights").  The Land Parcel and Access Rights, together with the improvements thereon are sometimes collectively referred to herein as the "Project".

In support of the amount listed in subparagraph (b), Larrabee testified that he relied on the Eighth Amendment to the Ritchie Agreement dated June 21, 2019, which was initially in place at the time the Cross-Claimants were negotiating the transaction contemplated by the Agreement (Exhibit 9) (the "Amended Ritchie Agreement").  Tr. 15:6-21 and 16:5-7.  The Amended Ritchie Agreement contemplated a total purchase price for the Land and access rights (as defined therein) of $7,000,000.  Amended Ritchie Agreement at 1, ¶ 1.  Larrabee testified that he would have had to pay the Ritchie Bros. $6.8 million dollars, plus closing costs at that time had the transaction closed.  Tr. 16:3.  In support of subparagraph (c), Larrabee cited paragraph 16(a) of the P&S Agreement, which required a new corporation to be created to take ownership of the property contemplated in the P&S Agreement and provided NH Highway with a 15% interest in the corporation.  P&S Agreement at 4; Tr. 23:5-13.  To calculate the damages relating to the Land, Larrabee subtracted the amount that was owed to Ritchie Bros. (b) from the appraised Land value (a), which came to a net equity value of $6,860,000.  Using the percentage ownership interest contemplated by the P&S Agreement, Larrabee multiplied the sum of $6,860,000 by 15% to get total Land damages of $1,029,000.

On cross-examination, Larrabee clarified that he gave the Land Appraisal to Mr. Cunningham and Mr. Bouchard, only.  Tr. 51:14-18.  Regarding the Land Appraisal's use of comparable sales of properties that were about 60 miles away, Larrabee speculated that those properties were likely used because they had "comparable traffic counts."  Tr. 52:3-4.  He did not provide any other information or documents supporting the current market value of the Land at the time of the breach.

i.  Analysis

Here, NH Highway contracted with the Cross-Defendants for the assignment of its rights under the Ritchie Agreement.  Pursuant to the P&S Agreement and NH Highway's Motion to

Assume and Assign the Ritchie Agreement to the Cross-Defendants (Bankruptcy Case, Doc. No. 92), NH Highway would only receive $400,000 of the $7,200,000 purchase price contemplated by the P&S Agreement and a 15% equity interest, while the remaining $6,800,000 would be paid to Ritchie Bros.[14]  Accordingly, the damages awarded to the Cross-Claimants must be the foreseeable loss of NH Highway's expected 15% equity position and the $400,000 payment it was supposed to receive from the $7,200,000 purchase price contemplated under the P&S Agreement, subject to the Court's determination regarding the validity of the liquidated damages clause.

After a review of the testimony and exhibits admitted into evidence, the docket in this proceeding and NH Highway's Bankruptcy Case, the Court concludes that the Cross-Claimants have not met their burden as to the claimed damages of $1,029,000, which purportedly reflects NH Highway's 15% equity position in the Land at the time of Lopes' breach.  In support, of this calculation, Larrabee used Land Appraisal's $13,860,000 valuation for the Land ("without any approvals for the hotel and whatever"), which he thought was "conservative" based on his 30 years of experience in the realms of real estate finance and development and the Land Appraisal. The Court does not agree.

The Land Appraisal is dated January 1, 2018, which is after the date that Ritchie Agreement was executed and more than two years before the parties executed the P&S Agreement.[15]  Although Larrabee testified that the bare Land was worth $13,860,000, almost twice the amount that a willing buyer would pay for it at or around the time of the breach, his inability to obtain an interested buyer at that price (before or after the Bankruptcy Case's filing,

---

[14] This reading of the P&S Agreement tracks Larrabee's testimony during the hearing that NH Highway agreed to accept less for the Land in exchange for an equity position in the new entity and that NH Highway was selling its right to purchase the Land and certain access rights (as opposed to selling the Land itself).  See Tr. 13:18-21; 23:21-25; 23:1-2.

[15] The Court notes that the P&S Agreement includes a typographical error as illustrated by the P&S Agreement.

the execution of the Stipulation, or the breach of the P&S Agreement) indicates otherwise. Moreover, $13,860,000 is a little under double the amount that Ritchie Bros. was willing to sell the right to buy the Land and certain rights to NH Highway prior to the commencement of the Bankruptcy Case and the execution of the Stipulation.  Indeed, the Ritchie Agreement provided for a purchase price of $7,000,000 (in addition to the $1,100,000 NH Highway had already paid), while the P&S Agreement contemplated a purchase price of the Land and the certain access rights for $7,200,000.  Here, Larrabee apparently believed that there was a willing buyer in the Spring of 2020 who would pay $13,860,000 for the Land (without any improvements), and that he reduced the amount he would accept for the Land in exchange for a $400,000 payment and 15% interest in Hooksett.  Unfortunately, neither the history of this proceeding and NH Highway's Bankruptcy Case, nor the outdated Land Appraisal, which was "prepared for the exclusive use of [Larrabee]" and "not intended for any other use," support the then-current fair market value of the Land as $13,860,000 at the time of the breach.

Accordingly, subject to the applicability of the liquidated damages clause, the Court finds that the Cross-Claimants are entitled to reasonable contractual damages relating to the loss of the Land in the amount of $535,000, which reflects the $400,000 that NH Highway was supposed to receive under the P&S Agreement and 15% of the equity in the Land.

Turning to the issue of the liquidated damages clause, the parties agree, and the P&S Agreement contemplated, at least in part, a real estate transaction (the sale of the Land and accesses rights), but is silent on how the property would be developed.  However, here the real estate transaction was between Ritchie Bros. and the Cross-Defendants, not the Cross-Claimants and the Cross-Defendants.  After construing the P&S Agreement in the context of the Cross-Claimants' and Cross-Defendant's business relationship and in reference to the Ritchie Agreement, the Court finds that the P&S Agreement is more properly characterized as an

assignment of the right to purchase Land and certain development rights attached to the Land, as opposed to a traditional sale of real estate. Based on the testimony given at trial and the evidence admitted into evidence, the Court does not believe that projected damages from a breach of the P&S Agreement were difficult to prove as required to satisfy the first prong of the three-prong test used to evaluate the enforceability of liquidated damages clauses under New Hampshire law. Here, the record shows that NH Highway was supposed to receive $400,000 for the sale of its right to purchase the Land and the related rights, and a 15% equity position in the company (and thus, the Land, and any revenue generated from the monetization of the Land and related rights). Turning to the third prong, the Court finds that the reduction of the Cross-Claimants' foreseeable damages to the $30,000 deposit would be unreasonable and grossly disproportionate to the actual damages sustained, given the actual damages analysis considered herein. Accordingly, the Court concludes that the liquidated damages clause is not enforceable. In so concluding, the Court notes that Lopes did not offer any evidence into the record supporting his position that the damages were difficult to ascertain or otherwise challenge the Cross-Claimants' analysis of the liquidated damages clause and applicable law.

      b. The Hotel

In subsection (d) of paragraph 10 in the Larrabee Affidavit, Larrabee listed damages that pertain to lost "value of hotel and restaurant approvals @ 15%" of $180,000. In support of that amount, Larrabee relied on a Feasibility Study of Proposed WoodSpring Suites that he had hired HVS Worldwide ("HVS"), a "feasibility company," to prepare (Exhibit 4) (the "Hotel Study"), as well as a May 7, 2021 Notice of Termination regarding a WoodSpring Suites Franchise Agreement with NH Highway dated June 12, 2015 (Exhibit 8) (the "Notice of Termination" and the "Franchise Agreement," respectively). Tr. 44:13-23. Larrabee explained that the Hotel Study envisioned an extended stay, medium class hotel. Tr. 45:16-21. He further testified that

the Notice of Termination was "just a verification that [he] did have a franchise for that particular brand," which was used by HVS in the Hotel Study and calculations and "somewhat" influenced his calculation of damages.  Tr. 46:8-20.  Larrabee primarily used the Hotel Study and "HVS's percentage of the value, the cost of a hotel for the approvals, the soft cost" to come up with the number he used.  Tr. 47:1-3.  He testified that HVS had "allotted 7% of the overall cost for approvals, soft costs, and whatever."  Tr. 47:4-5.  Because the hotel was "fully approved [and] ready for construction except paying the fees" he "used 11% of what [HVS] came up with as the build-out and the value of [the] hotel once built, which was $11,545,000."  Tr. 47:5-8.

Larrabee testified that, according to HVS, $11,545,000 was the market value of the hotel, had it been built.  Tr. 48:1.  He took 11% (the percentage applicable to the approvals component of the valuation) of $11,545,000, which equals $1,269,950.  Tr. 48:1-18.  Larrabee rounded that amount down to $1,200,000, which he said represented the value of the approvals.  Tr. 48:20-23; 49:16-21.  Next, he took 15% (the percentage he would receive under the P&S Agreement) of $1,200,000, to arrive at $180,000.  Tr. 49:1-3, 13-14, 18-21.

During the hearing Larrabee asserted that the Cross-Defendants knew about the hotel and restaurants approvals because Bruce Cunningham, who was allegedly the intermediary between Larrabee and the Cross-Defendants, had requested the documents ten days before the execution of the P&S Agreement.  Tr. 42:3-23; 43:9-13.  He further contended that Mr. Cunningham was the person who had "brought the initial offer to [him] from [Lopes] and . . . his partner."  Tr. 44:3-5.

### i. Analysis

The Court finds that the Cross-Claimants did not meet their burden of proof as to the claimed damages resulting from the alleged loss of the hotel.  Although Larrabee submitted the Hotel Study and the Notice of Termination in support of the claimed losses (Tr. 47:5-8), he did

not offer critical testimony into evidence that would have addressed a fundamental issue raised by the Notice of Termination: whether Larrabee would have had the ability to cure the defaulted Franchise Agreement had the Cross-Defendants performed on the P&S Agreement.  During the hearing, Larrabee explained that he submitted the Notice of Termination as "verification that [he] did have a franchise for [that] particular brand [of hotel]."  While the Notice of Termination is dated May 7, 2021, which is after the date of Lopes' breach of the P&S Agreement, it referenced NH Highway's April 30, 2019, breach of the Franchise Agreement and its failure to cure other defaults identified in a January 28, 2020, written Notice of Default.  The Notice of Termination also required NH Highway to pay $246,000 because of the breach of the Franchise Agreement. Nothing in the Notice of Termination or otherwise answers whether or how the default could have been cured or was otherwise curable.  As a result, the Court finds that the damages requested for losses related to the hotel and related approvals did not flow from Lopes' breach of the P&S Agreement and were not foreseeable, given the fact that they do not appear to have, on this record, been related to the breach or otherwise curable had the contract been performed.

   c. Gravel Sales

  In subsections (e)-(c) of paragraph 10 of the Larrabee Affidavit, Larrabee listed damages of $300,000 for "Gravel Sales."  In support of that amount, Larrabee relied on an e-mail (which he described as a "letter of intent") from Thomas Severino of Severino Trucking Co., Inc. (the "Severino Letter) and related negotiations with Severino (Exhibit 5).  Tr. 24:10-24; 26-2-6. Larrabee explained that Severino was going to "cut and fill" the Land, which involves grading the Land and removing material (which Severino can presumably sell or use for other projects). Larrabee testified, and the Severino Letter reflects, that Severino's estimate regarding the removal of 750,000 yards of material from Lots 4 and 5 at $2.00 per yard could generate $1,500,000 in revenue.  Tr. 25:13-24.  Regarding Lot 6, which is not contemplated by the

Severino Letter, Larrabee testified that there were about a million yards of excess gravel that could be removed.  Tr. 25:25-86.  He further testified that he had other discussions with Mr. Severino, who allegedly said they could remove 1 million yards of gravel from the Land.  Tr. 16:18-23; 26:25 to 27:1-3.  As a result, he used 15% of $2,000,000 instead of the $1,500,000 figure reflected in the Severino Letter to calculate the damages for lost gravel sales listed in subparagraph 10(e), which totaled $300,000.

During cross-examination, Larrabee explained that the $2.00 per yard revenue reflected a reduction in what he could have gotten had Severino not done "everything, soup to nuts."  Tr. 53:1-7.  He also noted that "gravel across the street, same type of material, same vein, was being sold for $4.50 to $5.00 [per yard] at the site."  Tr. 53:1-3.

i.  Analysis

The Court finds that the Cross-Claimants are entitled to damages in the amount of $225,000 for the loss of revenue relating to gravel sales, which represents 15% of the amount of revenue generated by 750,000 cubic yards of gravel priced at $2.00 per cubic yard from Lots 4 and 5 of the Land.  The Court declines to award damages for the additional 250,000 cubic yards of material Larrabee testified to having included in his calculation, as there is no indication in the Severino Letter supporting the grading and cutting of other lots, let alone the amount of material that such grading and cutting would produce.

The Court agrees with the Cross-Claimants that it may "vindicate what it inferred to have been the parties' reasonable expectations" under the P&S Agreement "by examining the contractual language, the [parties'] prior dealings, and the commercial context in which they dealt . . . ."  Centronics Corp., 132 N.H. at 141.  Here, the record supports that the parties contracted for the purpose of developing the Land to generate income.  While Lopes contends that he was unaware of any specific development plans for the Land, he did acknowledge that a

warehouse or other facility was being considered as well as the fact that the Cross-Claimants would lose rights attached to the Land (Tr. 66:18-25 to 67:1-9).

Unlike the testimony and evidence admitted during the hearing to support damages for the loss of potential hotel revenue, the Court finds that generating revenue from the natural resources attached to the Land was a known right under the terms of the P&S Agreement. Accordingly, the loss of the gravel sales revenue was a foreseeable consequence of the breach of the P&S Agreement because the parties contemplated some development of the Land that would involve preparing the bare Land for construction and generating income from the use of its natural resources.

        d.   Damages for Lost Water Revenue

In subsection (f) of paragraph 10 of the Larrabee Affidavit, Larrabee listed damages of $3,369,000 for "water loss @ 15% of projected revenue."  In support of the damages request, Larrabee relied on a Purchase Agreement between NH Highway and Tenney Mountain Water 2, LLC (Exhibit 6) (the "Water Agreement"), which was executed prior to NH Highway's bankruptcy filing; Addendum B to the Water Agreement; a letter (the "Water Letter") from a water company named Phoenix Revolution, Inc. ("Phoenix"), and hydrological water quality reports. Tr. 30:5-8; 31:6-25, 35:2-5.  During the hearing, Larrabee testified that there was a significant source of water on the Land, which the Cross-Defendants were aware of through Michael Bouchard, who Larrabee described as the Cross-Defendants' partner and as having done business on occasion through Tenney Mountain 2, LLC.  Tr. 29:6-24; 29:11-24.  Regarding Addendum B to the Water Agreement, Larrabee explained that Mr. Bouchard and "his group" had been working with Phoenix, and had agreed to give him 20% of the "deal."  Tr. 30:22-25 to 31:1.  Addendum B to the Water Agreement provided the "Larrabee Group (Jeff)" with a 20% ownership interest in Tenney Mountain 2, LLC.  Nevertheless, Larrabee testified that he used the

15% figure from the P&S Agreement as "that was the agreement that [he] made with [the Cross-Defendants]." Tr. 31:2-5.

In support of the calculation, Larrabee states that he had "grandfathered" approval from the State of New Hampshire to draw 400,000 gallons per day from the aquifer on the Land (Tr. 31:18-19), which he contends was a fact known to the Cross-Defendants. According to the Water Letter, and as explained by Larrabee during his testimony, Phoenix estimated that "the daily maximum potential extraction opportunity at this site, subject to the sitting and drilling of [potential additional wells was] approximately a maximum of 651,702 gallons per day, per well[,]" at a projected sale price of $0.15 per gallon. See Exhibit 6, Water Letter; Tr. 31:19-23, 33:1-14. He also testified that Phoenix estimated first-year operating costs of "about five million dollars" and a projected pay-down of construction costs of eight million dollars, resulting in a net of 5.4 million dollars after year-one. Tr. 34:1-9. Larrabee also testified that he paid for engineering studies by a Massachusetts hydrology company to determine the quality and amount of the water, and its life span. Tr. 34:13-15. He confirmed that the water was high quality, readily saleable, that its source was perpetual, and that the aquifer recharged. Tr. 34:15-23. Regarding the development plan for the Land and the water rights, Larrabee testified that the parties to the P&S Agreement understood that the plan was to develop the Land and build a water extraction facility on the Land. Tr. 32:9-12 and 20-25.

To calculate the damages, Larrabee multiplied 200,000 gallons per day (which he contends was half of the capacity he had at the time of the P&S Agreement), by $0.02 per gallon, which he contends came out to "a little over a million four a year" in revenue. Tr. 35:24-25 to 36:1. He then took 15% of that revenue, which he stated was somewhere around $219,000, and applied a 6.5% cap rate to obtain the total water damages amount of $3,369,000. Tr. 36:1-5. As he explained it, "if someone [had] paid [him] $3,369,000, they would [have gotten] a perpetual

6.5% return on that 3.3 million dollar annuity." Tr. 36:6-9.  In support of the 6.5% cap rate, which he thought was conservative, Larrabee stated that "Boston cap rates were under 5%," and pointed to the water's status as a "renewable resource" requiring no management.  Tr. 36:14-17. Nevertheless, Larrabee did not produce any documents or other evidence supporting Boston cap rate at the time of the breach.  Larrabee also stated that he did alternative calculations that produced a higher number but did not provide those calculations.  Tr. 36:21-24.

On cross examination, Larrabee acknowledged that he did not submit any exhibits reflecting the quality of the water or how much water was supposed to come up (Tr. 54:2-5, 7). Regarding the Water Letter, Larrabee explained that it represented one of two alternatives and that his calculations were more conservative.  Although Phoenix had suggested the use of five to six wells at 400,000 gallons per well per day, he used the minimum that Mr. Bouchard had wanted to use.  Tr. 54:14-23.

### i. Analysis

The Court finds that the Cross-Claimants are entitled to damages in the amount of $3,369,000 for the foreseeable loss of revenue relating to the development of the water rights on the Land, which was contemplated by the P&S Agreement.  Here, Larrabee's testimony supported the calculation of damages for loss of water sales revenue, which based on the use of 200,000 gallons per day at $0.02 cents per gallon, appears to be conservative and reasonable as the projected gallonage is half of the amount of water that the existing well generated per day, while the price per gallon is less than 20% of the amount that the Water Letter projected as the price "wholesale distributors paying a discounted $0.15 per gallon" under large volume purchase agreements would pay.  Tr. 54:13-23; 59:7-12.  Although Larrabee did not produce evidence supporting the use of a 5% cap rate in Boston at the relevant time, he testified that he used a 6.5% cap rate in his calculation because of the use of 5% cap rates in Boston.  Lopes did not

challenge the accuracy of that statement or Larrabee's use of the 6.5% cap rate.  Accordingly, the Court finds that Larrabee met his burden as to the application of the 6.5% cap rate.  Like the loss of revenue from gravel sales, the Court finds that NH Highway's 15% interest in the loss of revenue from the monetization of the known water source was a direct and foreseeable consequence of the breach of the P&S Agreement.  In addition to Lopes' own testimony, both the Water Agreement and the Water Letter demonstrate that the parties intended to and contemplated the monetization of the water source and potential sources (via additional wells) on the Land.  See Tr. 32:9-12; 35:16-25 to 36:1; 64:2-6; 67:5-9; 70:22-25 to 71:1-10; 71:22-25 to 72:1-2.

   e. The Sign

  In subsection (g) of paragraph 10 of the Larrabee Affidavit, Larrabee listed damages of $500,000 that he sustained in relation to the sign, which he described as "net after mitigation." During the hearing, Larrabee explained that the sign, which was allegedly the only such sign on Interstate 93 in New Hampshire, could service the development on the east side and west side of the highway.  He explained that he personally suffered damages caused by the Cross-Defendants because he agreed to "throw [the sign] into the deal for $1.8 million dollars."  Tr. 37:15-20.  See also Agreement at 1.  In support of the requested damages, Larrabee relied on the Agreement, which reflected the sale price of $1.8 million dollars for the sign) and a U.S. Department of Housing and Urban Development Statement for the sign (Exhibit 7) (the "HUD Statement"). The HUD Statement indicates that Larrabee and Interstate Hospitality, LLC ("Interstate Hospitality"), which is an entity owned by Larrabee, had sold certain real property and personal property to CJM Industries, LLC ("CJM").  During the hearing, Larrabee testified (somewhat confusingly) that Interstate Hospitality had sold the lot on which the sign is located to CJM for $350,000 (Tr. 40:1-3), while he sold the sign itself to CJM for $1.3 million dollars (Tr. 40:15-

30

19).  He further testified that he lost $500,000 because of the failure of the Cross-Defendants to close the P&S Agreement based on the $1.8 million sale price for the sign alone (Tr. 40:20-25). Lopes did not cross-examine Larrabee about the loss of damages relating to the sign, and appeared to acknowledge that the P&S Agreement contemplated the purchase of both the sign and the Land (Tr. 63:10-17).

   i.  Analysis

The Court finds that Larrabee sustained his burden for the loss of damages resulting from the difference between the $1,300,000 that he paid for the sign and the $1,800,000 purchase price provided for under the P&S Agreement.  Although the HUD Statement was not signed, Lopes did not challenge Larrabee's testimony that the transaction closed on the terms reflected in the HUD Statement.  Thus, the Court finds that the claimed damages of $500,000 would put Larrabee in the position that he would have been in had the Cross-Defendants performed under the P&S Agreement.

**IV.  CONCLUSION**

For the reasons stated herein, the Court finds that NH Highway is entitled to a total of $4,129,000, which consists of: (i) $535,000 in damages relating to the Land; (ii) $225,000 in damages for the loss of gravel sales revenue; and (iii) $3,369,000 in damages for the loss of water sales revenue.  The Court further finds that Larrabee is entitled to total damages of $500,000 for the loss he sustained relating to the sign.

This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.  The Court will issue a separate judgment consistent with this opinion.

ENTERED at Concord, New Hampshire.


Date:   September 20, 2023                    /s/ Bruce A. Harwood
                                             Bruce A. Harwood
                                             Chief Bankruptcy Judge